# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
### MACON DIVISION

| | |
|---|---|
| **ALTER ANTOINE,** | |
| *Plaintiff,* | |
| **v.** | **CIVIL ACTION NO.** |
| **NAVICENT HEALTH, INC.; MEDICAL CENTER OF CENTRAL GEORGIA, INC.; HEALTH SERVICES OF CENTRAL GEORGIA, INC.; NAVICENT PHYSICIANS HEALTH GROUP; TARNEISHA W. CHARLESTON; MATTHEW C. SMITH, M.D.; JOHN D. JILES; JENNIFER J. LOGAN; ANGIE HARROD; ABC CORPORATION # 1 – 5; and JOHN DOES # 1 – 5;** | **5:18-cv-00048-TES** |
| *Defendants.* | |

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT

This matter is before the Court on Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint [Doc. 48]. In their motion, Defendants maintain that Plaintiff's Second Amended Complaint [Doc. 42] is subject to dismissal for a multitude of reasons.

## INTRODUCTION

Defendants contend that the core of Plaintiff's Second Amended Complaint rests on his dissatisfaction with being discharged from the Medical Center of Central Georgia,

Inc.,[1] and his dissatisfaction with the legal proceedings in the Superior Court of Bibb County, Georgia, permitting his discharge. [Doc. 48-1 at p. 2]. In addition to these central points, Plaintiff's Second Amended Complaint clearly displays his dissatisfaction with the care he received as a patient in Defendants' facility. In this case, Plaintiff asserts an Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd ("EMTALA"), claim and medical malpractice claims against the defendant hospital (all of which Defendants argue are barred by res judicata and collateral estoppel) as well as claims for libel and slander; harassment; emotional distress; and invasion of privacy. [Doc. 42 at pp. 27-44]. In his final cause of action Plaintiff seeks to invalidate a lien filed by the Medical Center of Central Georgia, Inc., in relation to Plaintiff's time as a patient at the "[D]efendants' hospital facility." [*Id.* at p. 44].

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The Court takes the following facts from Plaintiff's Second Amended Complaint (unless otherwise noted) and assumes them to be true for the purposes of ruling on Defendants' motion. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

Phoebe Putney Memorial Hospital, located in Albany, Georgia, transferred Plaintiff Alter Antoine ("Plaintiff") to Navicent Health, Inc. ("Navicent Health"), in

---

[1] Plaintiff's Second Amended Complaint [Doc. 42] states that Navicent Health, Inc.; The Medical Center of Central Georgia, Inc., also known as Medical Center Navicent Health; Health Services of Central Georgia, Inc., are "all inter-related entities." [Doc. 42 at ¶ 6].

Macon, Georgia, on March 29, 2017, following his involvement in a motor vehicle accident. [Doc. 42 at ¶¶ 5-6].[2] According to Plaintiff, the nature of the injuries were severe. [*Id.* at ¶ 7]. The initial admitting diagnosis at Navicent Health included "a traumatic brain injury ("TBI"), a shear injury, intracerebral hemorrhage, grade 4 torn spleen, and grade 4 liver injury as well as numerous fractures, tears and lacerations[,] and other injuries." [*Id.*]. Plaintiff claims that "a TBI is one of the most devastating events and injuries [] a person can endure" and "patients can sustain permanent brain damage without proper neurological care." [*Id.* at ¶ 11]. Although Navicent Health supposedly knew of Plaintiff's traumatic brain injury, Plaintiff alleges that Navicent Health never provided neurological care despite him being admitted as a patient for more than five months. [*Id.* at ¶¶ 9, 12, 23].

On June 17, 2017, Navicent Health first cleared Plaintiff for discharge. [*Id.* at ¶¶ 15, 17]. According to Plaintiff, Dr. Smith testified (at a hearing in the Superior Court[3] of Bibb County) that Navicent Health's discharge records were not accurate. [*Id.* at ¶ 16]. Specifically, Dr. Smith testified:

> [Plaintiff] was unable to ambulate on his own, he was a serious risk to fall, [Plaintiff] was still dependent on a PEG feeding tube which had been surgically implanted into his stomach, [Plaintiff] was unable to medicate, unable to hydrate or feed himself, unable to urinate other than into a container thru [sic] a catheter attached to his penis, all while [Plaintiff] was

---

[2] Defendants' Brief [Doc. 48-1] confirms that the record shows Phoebe Putney Memorial Hospital in Albany, Georgia, to be the "local hospital" referenced in Plaintiff's Second Amended Complaint.

[3] Throughout this Order, the Court uses the terms "state court" and "superior court" interchangeably with the intention that both terms refer to the Superior Court of Bibb County, Georgia.

suffering from a severe stage 4 decubitus ulcer [ ], with severe ongoing cognitive deficits affecting his comprehension, speech, memory, and inability to even begin to make important independent decisions for himself.

[*Id.* (internal record citation omitted)].

Plaintiff alleges that a video, taken four days after Navicent Health cleared Plaintiff for discharge, shows that Plaintiff still required assistance from hospital employees to help reduce Plaintiff's risk of falling. [*Id.* at ¶ 17]. All in all, despite Plaintiff's allegations that he was nowhere near ready for discharge, Navicent Health still "wanted [Plaintiff] to be out their door." [*Id.* at ¶¶ 22, 23]. Plaintiff contends that beginning on June 17, 2017, and continuing through "and beyond" August 9, 2017, Navicent Health conspired to evict Plaintiff. [*Id.* at ¶ 24].

On August 9, 2017, Navicent Health deemed Plaintiff safe for discharge for a second time, a decision that, Plaintiff argues, was based on false grounds. [*Id.* at ¶¶ 32, 33]. According to Plaintiff, nursing and assisting staff conspired, and without direction from a medical doctor, wheeled Plaintiff out of his hospital room "all the way down to Navicent's discharged patient pick-up area and dumped him there." [*Id.* at ¶ 34]. In doing so, Plaintiff contends that Defendants "recklessly and wantonly created a living

nightmare for Plaintiff." [*Id.* at ¶ 39].[4] Plaintiff states that he "was returned to the hospital as a patient because the hospital feared publicity from a news reporter who was on her way to Navicent having heard about what Navicent had done to [Plaintiff]." [*Id.* at ¶ 48].

Plaintiff claims that Defendants' "stunningly reckless" and "uncaring" attitude "permeated" each Defendant to the extent that they all "made significant effort" to "illegally discharge [Plaintiff]." [*Id.* at ¶ 26]. For example, Plaintiff states that Navicent Health did not contact Plaintiff's brother before discharge, which, according to Dr. Smith's testimony (at the superior-court hearing), was not appropriate since Plaintiff's brother was "supposed to be the one helping him." [*Id.* at ¶¶ 30, 31].

Eventually, given Plaintiff's refusal to leave, Navicent Health sought an injunction from the Superior Court of Bibb County to remove Plaintiff on the grounds of criminal trespass. [*Id.* at ¶¶ 54-56, 60]. In what Plaintiff calls an "attempt to double down on [Navicent Health's] insatiable desire to lock [Plaintiff] out," Navicent Health presented a "false set of legal papers" for immediate review by the court system. [*Id.* at ¶¶ 54-55]. According to Plaintiff, Navicent not only sought court intervention, but also "proudly"

---

[4] While the Court assuredly recognizes the passionate representation by Plaintiff's attorney, his Second Amended Complaint (as well as the previous iterations), was drafted more in the vein of a public relations release or closing argument than a complaint that complied with the plain meaning of Federal Rule of Civil Procedure 8(a). The Second Amended Complaint was teeming with certain words, phrases, and, on some occasions, whole paragraphs that could not be and were not considered. Salacious word choices such as: "created a living nightmare," "[w]hat a ludicrous and perverse theory," "an outrageous Goliath attempt," "the most glaring sign of the bottomless void," and "to stick it to [Plaintiff] one more time" (just to note a few) have no bearing on the actual substance pled in Plaintiff's pleading and did little to assist the Court. [Doc. 42 at ¶¶ 39, 54, 61, 104, 114].

and "maliciously accused [Plaintiff] of being a criminal trespasser by remaining at Navicent." [*Id.* at ¶¶ 56, 74].

Plaintiff asserts that Navicent Health's "slanderous injunction case was a manipulation of the court system . . . so that [Plaintiff] would leave the hospital." [*Id.* at ¶ 62]. Specifically, Plaintiff now claims that the injunction application "did not contain a scintilla of records, evidence[,] nor medical statements to support their allegation of irreparable harm, because there was none." [*Id.* at ¶ 79]. To that end, Plaintiff concludes that the motive behind evicting Plaintiff was purely out of financial concern. [*Id.* at ¶ 78].

In light of these events, Plaintiff takes issue with Navicent Health's removal of "their traumatic brain injured patient" from his hospital room to the exit with "no medication," "nowhere to go," and "no one to pick him up." [*Id.* at ¶ 59]. Plaintiff characterizes Navicent Health's actions as "grotesque" and "an outrageous Goliath attempt to stomp out this 33[-]year[-]old man and to cover up their willful neglect and abuse." [*Id.* at ¶¶ 59, 61]. According to Plaintiff, Dr. Smith testified on several occasions at the superior-court injunction hearing that this particular conduct was "wrong," "reprehensible," and "unacceptable negligence." [*Id.* at ¶¶ 66, 67].

On August 15, 2017, Navicent Health brought Dr. Smith into Plaintiff's hospital room for what Plaintiff argues was a means to "cook up" three lines in the record that Plaintiff was "supposedly safe for discharge to Hemlock Street or out to a Macon homeless shelter. [*Id.* at ¶¶ 81, 86]. Later, however, Plaintiff contends Dr. Smith recanted

on cross-examination and stated that his previous decision authorizing discharge was "totally improper, dangerous, and life threatening." [*Id.* at ¶ 87].

According to Plaintiff, the superior court ruled that Navient Health "could *not* throw [Plaintiff] out the door." [*Id.* at ¶ 93 (emphasis added)].[5] After having heard testimony from only two witnesses and after determining that the hospital's case "had to stop," the superior court judge nevertheless granted Navient Health's injunctive relief permitting Plaintiff's discharge, *but* told "the hospital that they could not discharge [Plaintiff] without the proper care in place." [*Id.* at ¶¶ 105, 106 (emphasis omitted)]. Navient Health had "to provide and pay for months of in-patient rehabilitation care at Navient Health's own expense." [*Id.* at ¶¶ 93-94]. Specially, the superior court ordered that

> [i]n order to provide a safe place for [Plaintiff] to continue his next level of outpatient treatment after his discharge from The Medical Center, Navient Health, is ordered to pay up to $400.00 per day, or $12,000.00 per month, for up to a maximum of one hundred (100) days for [Plaintiff] to be admitted to a skilled nursing facility of [Navient Health's] choice for the purpose of providing safe lodging and nutrition for [Plaintiff] as he transitions from an acute care hospital.

---

[5] The representation that is intended by this statement is undeniably misleading. In fact, according to the Final Order of the Superior Court of Bibb County, the superior-court judge *clearly* granted Navient Health's application for a permanent injunction. [Doc. 33-2 at p. 5, ¶ 1]. Plaintiff's assertion to the Court in his Second Amended Complaint that Navient Health "clearly los[t]" is an egregious fabrication. The Superior Court's order unequivocally states that "Respondent shall be discharged from the Medical Center." [*Id.* at p. 5, ¶ 2]. However, despite the superior court's permission to discharge Plaintiff, this discharge (as Plaintiff does correctly state) was not without certain conditions. *See* [*id.* at pp. 5-8].

[Doc. 33-2 at pp. 5-6]. After 160 days,[6] Navicent discharged Plaintiff on September 5, 2017.

[Doc. 33-3]. But, in an attempt "to stick it to [Plaintiff] one more time," Plaintiff alleges

that Navicent "secretly filed a purported lien for their alleged billing," never letting

Plaintiff know of their plans. [Doc. 42 at ¶ 114].

Following his discharge, Plaintiff filed the instant lawsuit in the United States

District Court for the Southern District of New York on December 28, 2017. [Doc. 1]. The

next day, after receiving filing errors, Plaintiff re-filed his initial Complaint [Doc. 1]

against Defendants. *See* [Doc. 3]. Before its service, Plaintiff attempted to amend his initial

Complaint on January 29, 2018, but once again received a filing error with instructions

regarding how to properly label and file what would become his First Amended

Complaint [Doc. 26]. *See* [Doc. 24]. However, before correcting his filing errors the

following day, Plaintiff's attorney, Mr. David Panitz, filed a letter dated January 29, 2018,

and addressed to the Southern District of New York district court judge assigned to his

client's case. [Doc. 25]. In his letter, Mr. Panitz asked that Court "in lieu of a more formal

application to voluntarily transfer this case pursuant to 28 U.S.C. § 1404, from the District

Court for the Southern District of New York to the District Court for the Middle District

---

[6] Plaintiff's Second Amended Complaint provides that Plaintiff's admission date to Navicent Health was March 9, 2017. [Doc. 42 at ¶¶ 5-6]. While the Second Amended Complaint details what transpired up to the date of Plaintiff's discharge, it does not provide a date certain on which Navicent Health discharged Plaintiff. However, the date of discharge, according to Defendants' Notice of Filing Hospital Lien, was September 5, 2017. [Doc. 33-3].

of Georgia." [*Id.* at p. 1]. Then, on January 30, 2018, Plaintiff filed his First Amended Complaint. [Doc. 26].

On January 31, 2018, the District Court for the Southern District of New York ordered that "th[is] action be transferred to the U.S. District Court for the Middle District of Georgia." [Doc. 27 at p. 2]. Having been served,[7] Defendants filed a Motion to Dismiss [Doc. 33] Plaintiff's First Amended Complaint on March 5, 2018. On March 26, 2018, exactly 21 days after Defendants' service of their motion under Federal Rule of Civil Procedure 12(b), Plaintiff filed a Second Amended Complaint [Doc. 42]. However, Plaintiff failed to seek leave of court regarding his second attempt to amend his complaint. *See* Fed. R. Civ. P. 15. Plaintiff's purported Second Amended Complaint could not be an amendment as a matter of right because he previously filed his First Amended Complaint on January 30, 2018, thereby exhausting Rule 15's right to amend "*once* as a matter of course." Fed. R. Civ. P. 15(a)(1) (emphasis added); *Stephens v. Atlanta Indep. Sch. Sys.*, No. 1:13-cv-978-WSD, 2013 WL 6148099, at *2 (N.D. Ga. Nov. 22, 2013).

In an effort to clarify the controlling pleading in this case, the Court held a telephone conference during which Defendants "consent[ed] that the Plaintiff may amend his Complaint by the filing of this Second Amended Complaint, such already

---

[7] The record reflects that electronic summonses were issued to each Defendant on January 3, 2018, and given Defendants' responsive pleading it appears that Defendants were definitively served. [Docs. 14-23].

being filed of record on March 26, 2018." [Doc. 50 at p. 1]. Defendants now seek dismissal of Plaintiff's Second Amended Complaint in their re-filed Motion to Dismiss [Doc. 48].

## DISCUSSION

### A.    Standard of Review

Defendants seek to dismiss Plaintiff's action against them for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). When ruling on a 12(b)(6) motion, district courts must accept the facts set forth in the complaint as true. *Twombly*, 550 U.S. at 572. A complaint survives a motion to dismiss only if it alleges sufficient factual matter (accepted as true) that states a claim for relief that is plausible on its face. *McCullough v. Finley*, 907 F.3d 1324, 1333 (11th Cir. 2018) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). In fact, a well-pled complaint "may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (citations omitted).

Although Federal Rule of Civil Procedure 8 does not require detailed factual allegations, it does require "more than [ ] unadorned, the-defendant-unlawfully-harmed-me accusation[s]." *McCullough*, 907 F.3d at 1333 (citation omitted); *see also* n.4, *supra*. To decide whether a complaint survives a motion to dismiss, district courts are instructed to use a two-step framework. *Id.* The first step is to identify the allegations that are "no more than mere conclusions." *Id.* (quoting *Iqbal*, 556 U.S. at 679). "Conclusory allegations are not entitled to the assumption of truth." *Id.* (citation omitted). After disregarding the

10

conclusory allegations, the second step is to "assume any remaining factual allegations are true and determine whether those factual allegations 'plausibly give rise to an entitlement to relief.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679).

Furthermore, a complaint attacked by a 12(b)(6) motion is subject to dismissal when it fails to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (citation omitted). "A plaintiff must plead more than labels and conclusions or a formulaic recitation of the elements of a cause of action." *McCullough*, 907 F.3d at 1333 (internal quotations omitted); *see also Twombly*, 550 U.S. at 555. "To be sure, a plaintiff may use legal conclusions to structure his complaint, but legal conclusions 'must be supported by factual allegations.'" *McCullough*, 907 F.3d at 1333 (quoting *Iqbal*, 556 U.S. at 679). While courts, in ruling on a motion to dismiss, must take all of the factual allegations in the complaint as true; they are not bound to accept a legal conclusion couched as a factual allegation. *Iqbal*, 556 U.S. at 678. Courts must "identify conclusory allegations and then discard them—not 'on the ground that they are unrealistic or nonsensical' but because their conclusory nature 'disentitles them to the presumption of truth.'" *McCullough*, 907 F.3d at 1333 (quoting *Iqbal*, 556 U.S. at 681).

The issue to be decided when considering a motion to dismiss is not whether the claimant will ultimately prevail, but "whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *overruled on other grounds by Davis v. Scheuer*, 468 U.S. 183 (1984). The factual allegations in a complaint "must be

enough to raise a right to relief above the speculative level" and cannot "merely create[] a suspicion [of] a legally cognizable right of action." *Twombly*, 550 U.S. at 545, 555 (second alteration in original). Finally, complaints that tender "'naked assertion[s]' devoid of 'further factual enhancement'" will not survive against a motion to dismiss. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557) (alteration in original). Stated differently, the complaint must allege enough facts "to raise a reasonable expectation that discovery will reveal evidence" supporting a claim. *Twombly*, 550 U.S. at 556. With the foregoing standard in mind, and taking the facts asserted in Plaintiff's Second Amended Complaint as true, the Court rules on Defendants' Motion to Dismiss.

## B.     <u>Defendants' Motion to Dismiss [Doc. 48]</u>

Defendants' Brief in Support of its dismissal motion sets forth ten arguments regarding Plaintiff's claims. *See generally* [Doc. 48-1]. The first and third arguments are based on procedural grounds—namely a lack of diversity jurisdiction, res judicata, and collateral estoppel. [*Id.* at pp. 7, 10]. Defendants' second argument, however, discusses Plaintiff's only federal law claim, his EMTALA claim against the defendant hospital. [*Id.* at p. 9]. In that argument, Defendants assert that EMTALA, in regards to this case, is inapplicable on the basis that EMTALA "does not apply to [the] discharge of a non-emergent, stable patient." [*Id.*]. Next, as additional grounds for dismissal of Plaintiff's medical malpractice claims, Defendants argue that Plaintiff failed to file the accompanying medical affidavit as required by Ga. Code Ann. § 9-11-9.1. [*Id.* at p. 12].

And, finally, Defendants' remaining arguments as to Plaintiff's medical malpractice; libel and slander; harassment; emotional distress; invasion of privacy; invalidation of a hospital lien; and attorney's fees claims all incorporate the traditional motion-to-dismiss standard of failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *See generally* [*id.*].

### C.   <u>Jurisdiction</u>

The Court must determine whether it has subject-matter jurisdiction over this case before it can address any substantive arguments presented by the parties as to Plaintiff's claims. *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 435 (2011) ("[F]ederal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press."). The claims presented in this case potentially invoke two avenues by which a case may be filed in federal court: federal-question jurisdiction and diversity jurisdiction.

#### 1.   <u>Federal Question Jurisdiction Under 28 U.S.C. § 1331</u>

As a preliminary matter, the Court rules on Plaintiff's EMTALA claim before discussing Defendants' diversity of citizenship concerns and their other jurisdictional and procedural arguments as to Plaintiff's remaining state-law claims.

As previously alluded to, Plaintiff's EMTALA claim is his only claim invoking federal-question jurisdiction under 28 U.S.C. § 1331,[8] which would normally give the Court original jurisdiction over this case. In light of this Court's duty to undertake an independent inquiry as to its jurisdiction, it finds that it lacks federal-question jurisdiction as to Plaintiff's EMTALA claim under *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923) and *D.C. Court of Appeals v. Feldman*, 460 U.S. 462 (1983). *See Pate v. Chilton Cty. Bd. of Educ.*, 853 F. Supp. 2d 1117, 1128 (M.D. Ala. Jan. 4, 2012) (citing *Ebrahimi v. City of Huntsville Bd. of Educ.*, 114 F.3d 162, 165 (11th Cir. 1997) ("Federal courts have an independent duty to determine whether they have jurisdiction and to police the boundaries of their jurisdiction.")); *see also Hoblock v. Albany Cty. Bd. of Elections*, 422 F.3d 77, 83 (2d Cir. 2005) ("The district court raised *Rooker-Feldman* sua sponte . . . .").

"Where a federal suit follows a state suit, the former may be prohibited by the so-called *Rooker-Feldman* doctrine in certain circumstances." *Hoblock*, 422 F.3d at 83. The United States Supreme Court has observed that the *Rooker-Feldman* doctrine "recognizes that [while] 28 U.S.C. § 1331 is a grant of original jurisdiction, [it] does not authorize district courts to exercise appellate jurisdiction over state-court judgments, which Congress has reserved to th[e] [United States Supreme Court]." *Sophocleus v. Ala. Dep't of Transp.*, 170 F. App'x 608, 610 (11th Cir. 2005) (citing *Exxon Mobil Corp. v. Saudi Basic Indus.*

---

[8] "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331.

*Corp.*, 544 U.S. 280, 292 (2005)); *see also* 28 U.S.C. § 1257(a). After due consideration and for the reasons that follow, the Court finds the *Rooker-Feldman* doctrine controls so that it does not have federal subject-matter jurisdiction over Plaintiff's EMTALA claim.

*Rooker* stands for the proposition that "a United States District Court has no authority to review final judgments of a state court in judicial proceedings." *Wood v. Orange Cty.*, 715 F.2d 1543, 1546 (11th Cir. 1983) (quoting *D.C. Court of Appeals v. Feldman*, 460 U.S. 462, 467 (1983)). Cases are subject to the *Rooker-Feldman* doctrine if: (1) the federal-court plaintiff lost in state court; (2) the federal-court plaintiff complains of injuries caused by a state-court judgment; (3) the plaintiff's federal suit invites district-court review and rejection of the state-court judgment; and, (4) the state-court judgment was "rendered before the [district-court] proceedings commenced."[9] *Hoblock*, 422 F.3d at 85. Despite Plaintiff's clear allegation that Navicent Health's actions violated EMTALA, such a claim raised in this Court (a United States District Court)—in light of the circumstances surrounding Plaintiff's state and federal cases—"complain[s] of [an] injury [caused] by" the Superior Court of Bibb County (a state court) and prompts a *Rooker-Feldman* analysis. *Id.* at 88.

---

[9] The first and fourth of these requirements have been categorized as "procedural" while the second and third requirements possess "substantive" characteristics. *Hoblock*, 422 F.3d at 85.

At the outset, and in order to ensure *Rooker-Feldman*'s applicability to Plaintiff's EMTALA claim, the Court first details the doctrine's substantive requirements. Embedded in the *Rooker-Feldman* doctrine is the principle, expressed by Congress in 28 U.S.C. § 1257, that within the federal judicial system, only the United States Supreme Court may review state-court decisions (aside from habeas review[10]). *Id.* at 85; *see also Casale v. Tillman*, 558 F.3d 1258, 1260 (11th Cir. 2009) (per curiam), *infra*. This principle "animates the two substantive requirements for *Rooker-Feldman*'s application outlined in *Exxon Mobil:* [(1)] the federal plaintiff must complain of injury from a state-court judgment; and [(2)] the federal plaintiff must seek federal-court review and rejection of the state-court judgment." *Hoblock*, 422 F.3d at 85.

The Second Circuit Court of Appeals in *Hoblock*

> points out that 28 U.S.C. § 1257 (and thus *Rooker-Feldman*) does not deprive a district court of subject-matter jurisdiction simply because a party attempts to litigate in federal court a matter previously litigated in state court. *If a federal plaintiff 'present[s] some independent claim*, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party . . . , *then there is jurisdiction* and state law determines whether the defendant prevails under principles of preclusion.'

*Id.* at 86 (quoting *Exxon Mobil*, 544 U.S. at 293) (alteration in original) (emphasis added). Stated differently, if the federal plaintiff presents an independent claim then the court can exercise subject-matter jurisdiction and *Rooker-Feldman* cannot bar the claim. Independent

---

[10] Habeas review is an exception to *Rooker-Feldman* principles. *Id.* at 85 n.5.

claims are outside of *Rooker-Feldman*'s reach even if they involve the identical subject matter and parties as the previous state-court suit. *Id.* Nevertheless, the defendant may still prevail, but state law will determine whether the plaintiff's federal suit is subject to preclusion. *Id.*; *see also* Section (C)(1)(c)(i) and (ii), *infra*.

By that same token, if the plaintiff presents, in federal court, a non-independent claim, then *Rooker-Feldman* will, subject to the doctrine's procedural requirements, bar the plaintiff's suit due to a lack of jurisdiction. *See Hoblock*, 422 F.3d at 86-87. A claim's status as either independent or non-independent is adjudicated using the "inextricably intertwined"[11] standard. *Id.* "A claim is inextricably intertwined if it would effectively nullify the [state-court] judgment, or if it succeeds only to the extent that the state court wrongly decided the issues." *Antoine v. Vernin*, No. 18-10645, ___ F. App'x ___, 2018 WL 3860477, at *2 (11th Cir. Aug. 14, 2018) (citing *May v. Morgan Cty.*, 878 F.3d 1001, 1005 (11th Cir. 2017)).

Initially, a federal claim—like EMTALA—may seem independent because Plaintiff did not assert such claim during his state-court proceedings. However, just presenting a legal theory to a federal court that was not raised in state court cannot

---

[11] Again, "[i]f the [federal] claims presented to a United States district court are *inextricably intertwined* with the state court's [decision] in a judicial proceeding . . . then the district court is in essence being called upon to review the state-court decision. This the district court may not do." *Hoblock*, 422 F.3d at 84 (emphasis in original) (quoting *Feldman*, 460 U.S. at 483-84 n.16). The United States Supreme Court's use of the phrase "inextricably intertwined" means, "at a minimum, that where a federal plaintiff had an opportunity to litigate a claim in a state proceeding . . . subsequent litigation of the claim will be barred under the *Rooker-Feldman* doctrine if it would be barred under the principles of preclusion." *Id.*

insulate the plaintiff's federal suit from *Rooker-Feldman* if the federal suit complains of injury resulting from a state-court judgment and effectively seeks to have that state-court judgment reversed. *Hoblock*, 422 F.3d at 86. "[S]uch federal [] claims, even if not raised in state court, are 'inextricably intertwined' with the challenged state-court judgment . . . and therefore a federal district court lacks jurisdiction over such claims because 'the district court is in essence being called upon to review the state-court decision.'" *Id.* (citing *Feldman*, 460 U.S. at 483-84 n.16). To that end, the Court is tasked with deciding whether Plaintiff's federal suit seeks "review and reversal" of the state-court judgment. *Id.* at 87. In one sense, no: Plaintiff does not seem to want the Court to evaluate the state court's reasoning or review the substance of the state court's ultimate decision permitting his discharge from the hospital. *See id.* However, as explained above, a federal suit is not free from *Rooker-Feldman*'s bar simply because the suit proceeds on legal theories not addressed in state court. *Id.* at 87.

Even if what Plaintiff seeks is not a strict "review" of the state court's final order, he does—by virtue of the federal claim enumerated in his Second Amended Complaint— effectively seek reversal. *See id*; *see also* [Doc. 42 at ¶ 79 ("The hospital's injunction application of August 9[th], 2017[,] did not include a scintilla of records, evidence[,] nor medical statements to support their allegation of irreparable harm, because there was none.")]. The state court ordered that Plaintiff could be discharged, and now Plaintiff ostensibly wants the federal court to rule that The Medical Center of Central Georgia, Inc.

(the petitioner in the earlier superior court case), violated EMTALA *because* it followed the state-court order. Clearly, The Medical Center of Central Georgia, Inc., could not comply with both the state-court order *and* Plaintiff's desired federal-court ruling—that he has sufficiently stated an EMTALA claim to withstand a motion to dismiss. Thus, the relief sought in Plaintiff's Second Amended Complaint, "if granted, would seem to 'reverse' the state-court judgment." *Hoblock*, 422 F.3d at 87.

On the other hand, *Hoblock* notes that an independent and, therefore, non-barred claim may "den[y] a legal conclusion" reached by a state court. *Id.* (citing *Exxon Mobil*, 544 U.S. at 293). The *Hoblock* court stresses that "[p]recisely what ['deny a legal conclusion'] means is not clear" from either *Exxon Mobil* or *GASH Ass'ns v. Village of Rosemont*, 995 F.2d 726, 728 (7th Cir. 1993) (the original source of the language), "but it suggests that a plaintiff who seeks in federal court a result opposed to the one he achieved in state court does not, for that reason alone, run afoul of *Rooker-Feldman*." *Id.* In hopes of clarifying this phrase, and by extension clarifying the doctrine's applicability, *Hoblock* tells us that "the key to resolving this uncertainty lies in the second substantive *Rooker-Feldman* requirement: that federal plaintiffs are not subject to the *Rooker-Feldman* bar *unless* they *complain of an injury* caused by a state judgment." *Id.* (second emphasis in original).

First, this requirement answers why a federal plaintiff cannot escape the *Rooker-Feldman* bar simply by relying on a legal theory not raised in the state court. *Hoblock* provides the perfect illustration:

> Suppose a state court, based purely on state law, terminates a father's parental rights and orders the state to take custody of his son. If the father sues in federal court for the return of his son on grounds that the state judgment violates his federal substantive due-process rights as a parent, he is complaining of an injury caused by the state judgment and seeking its reversal. This he may not do, regardless of whether he raised any constitutional claims in state court, because only the Supreme Court may hear appeals from state-court judgments.

422 F.3d at 87. This hypothetical scenario is markedly similar to the proceedings involved in this case. "In effect, [Plaintiff]," by filing his EMTALA claim, "seeks to challenge collaterally the state . . . court proceedings" that gave The Medical Center of Central Georgia, Inc., the authority to discharge him, and this he may not do because "federal courts are not a forum for appealing state[-]court decisions." *Staley v. Ledbetter*, 837 F.2d 1016, 1017-18 (11th Cir. 1988) (per curiam); *see also Wood*, 715 F.2d at 1546 ("[F]ederal review of [state-court] decisions is entrusted solely to the Supreme Court, [the lower federal courts] may not decide federal issues that are raised in state proceedings and 'inextricably intertwined' with the state court's judgment. *Feldman*, moreover, indicates that the *Rooker* bar also operates where the plaintiff fails to raise his federal claims in state court.") (internal citation omitted)).

Further, by focusing on the requirement that the state-court judgment be the source of the injury, it is clear how a suit potentially asking a federal court to "den[y] a

legal conclusion" could be deemed "independent," and therefore unfit for *Rooker-Feldman* adjudication. *Hoblock*, 422 F.3d at 87. Assuredly, the Court recognizes "[t]he fact that the state court chose not to remedy the injury does not transform the subsequent federal suit on the same matter into an appeal, [which is] forbidden by *Rooker-Feldman*, of the state-court judgment." *Id.* at 88. However, it does seem obvious that a federal plaintiff cannot avoid *Rooker-Feldman* simply by clever pleading, such as alleging that actions taken pursuant to a court order violate his rights without ever challenging the state-court order itself. *Id.* Revisiting *Hoblock*'s child-custody scenario just discussed,

> if the state has taken custody of a child pursuant to a state judgment, the parent cannot escape *Rooker-Feldman* simply by alleging in federal court that he was injured by the state employees who took his child rather than by the judgment authorizing them to take the child. The example shows that in some circumstances, federal suits that purport to complain of injury by individuals in reality complain of injury by state-court judgments.

*Id.* Still the question remains: when does a federal suit complain of an injury caused by a state-court judgment?

A federal suit complains of a state-court judgment even if it appears to only claim a purported violation by a third party's actions—in this case, The Medical Center of Central Georgia, Inc.—when in fact, the third party's actions were produced by the state-court judgment. *Id.* "Where a state-court judgment causes the challenged third-party

action, any challenge to that third-party action is necessarily the kind of challenge to the state judgment that only the Supreme Court can hear." *Id.*[12]

As briefly discussed above, presenting a legal theory in the federal suit that was not raised in state court cannot insulate the federal plaintiff's suit from *Rooker-Feldman* when the federal suit complains of an injury from a state-court's judgment. *Id.* at 87. In this case, Plaintiff cannot escape *Rooker-Feldman* by alleging, via EMTALA, that he was injured by hospital personnel (the party who actually discharged him) rather than by the state-court judgment that permitted his discharge. *See id.* at 88. Plaintiff had every reasonable opportunity to raise his alleged EMTALA violation during the fervid state court proceedings. *May*, 878 F.3d at 1005 ("[*Rooker-Feldman*] does not apply, however, where a party did not have a reasonable opportunity to raise his federal claim in state proceedings.").

In fact, a reasonable reading of Plaintiff's Second Amended Complaint shows that Plaintiff clearly made EMTALA arguments in the superior court. For example, Plaintiff claims that The Medical Center of Central Georgia, Inc., "kn[ew] they had already illegally discharged and forced [Plaintiff] out" and that "[i]t was only [Plaintiff], not

---

[12] *Hoblock* states the obvious connection between this substantive requirement and *Rooker-Feldman*'s procedural requirement concerning timing,

> the requirement that the federal suit be initiated after the challenged state judgment. If federal suits cannot be barred by *Rooker-Feldman* unless they complain of injuries produced by state-court judgments, it follows that no federal suit that precedes a state-court judgment will be barred; the injury such a federal suit seeks to remedy cannot have been produced by a state-court judgment that did not exist at the federal suit's inception.

*Id.* at 88.

Navicent, who had the emergency need for court intervention as a result of Navicent's wrongful discharge . . . ." [Doc. 42, at ¶¶ 55, 58]. Secondly, Plaintiff himself unequivocally alleged that "defendants carelessly and without concern for [his] care, sabotaged [his] personal circumstances, knowing that [he] would *suffer irreparable harm* by what they were doing to him." [*Id.* at ¶ 76 (emphasis added)]. Lastly, Plaintiff, at the time of the proceedings in the Superior Court of Bibb County, even presented testimony in which Dr. Matthew C. Smith, M.D., "conceded . . . that [the June 17, 2017,] discharge of [Plaintiff] was totally improper, dangerous, and life threatening." [*Id.* at ¶¶ 15, 87]. Without a doubt, Plaintiff had every reasonable opportunity to file an EMTALA counterclaim,[13] as well as his other state-law claims, against The Medical Center of Central Georgia, Inc., however, he chose not to do so.

Notwithstanding the applicability of *Rooker-Feldman*'s two substantive requirements, the doctrine's true applicability will turn on whether Plaintiff's federal suit meets the remaining procedural requirements pertaining to timing and party identity as outlined in *Exxon Mobil*. *Hoblock*, 422 F.3d at 89.

b.     *The Procedural* Rooker-Feldman *Requirements*

Even if a court, in examining *Rooker-Feldman*'s possible application, finds that a federal plaintiff's suit meets the second and third *Rooker-Feldman* requirements (that the

---

[13] Whether such claims would have been successful at that time is irrelevant and therefore not before the Court for consideration.

federal suit complains of state-court judgment and the federal suit seeks or invites review or reversal of the state-court judgment) the inquiry cannot stop there. Because the doctrine "does not automatically bar every federal suit that seeks review and rejection of an injury-creating state decision," federal suits—like this one—must also meet the first and fourth "procedural" *Rooker-Feldman* requirements: (1) the federal suit must follow the state judgment; and (2) the parties in the state and federal suits must be the same. *Id.* (citing *Exxon Mobil*, 544 U.S. at 284).

In this case, the first requirement is straightforward. The Superior Court of Bibb County entered its final order granting The Medical Center of Central Georgia, Inc.'s, request for injunctive relief to discharge Plaintiff on August 31, 2017, and Plaintiff commenced his federal suit on December 28, 2017. [Docs. 1; 33-2]. Thus, *Rooker-Feldman*'s first procedural requirement is unquestionably satisfied. However, the second requirement, common party identity, is less easily determined.

In his federal suit, Plaintiff named 11 other defendants in addition to The Medical Center of Central Georgia, Inc., the original state-court petitioner. Therefore, the Court is left with the question of whether these 11 additional defendants could nonetheless be considered common parties for *Rooker-Feldman* purposes. *See Hoblock*, 422 F.3d at 89.

Because the Court finds that Plaintiff's EMTALA claim is non-independent of his state-court suit and because *Rooker-Feldman* is a doctrine of federal subject-matter jurisdiction, the Court must look to federal law to determine whether the former state-

court petitioner, The Medical Center of Central Georgia, Inc., should be treated, for *Rooker-Feldman* purposes, as if it and its agents were parties to the state-court suit in which Plaintiff was the respondent. *See id.* at 89. The Court admits that claim and issue preclusion are distinct from the *Rooker-Feldman* doctrine, but because Plaintiff's EMTALA claim is non-independent, federal preclusion laws guide the federal jurisdictional issue at hand. *Id.* at 90.

To help guide lower-courts' decisions on this issue, the United States Supreme Court uses the term "privity" to discuss when "a nonparty may be bound by an earlier judgment." *Id.* (citing *Richards v. Jefferson Cty.*, 517 U.S. 793, 798 (1996)). Using *Richards*, the *Hoblock* court posed the party-identity question this way: "is there sufficient privity, as a matter of federal law, between the [11 additional defendants] and [The Medical Center of Central Georgia, Inc.] that the [11 additional defendants] should be considered parties to, and bound by, [The Medical Center of Central Georgia, Inc.'s] state lawsuit against [Plaintiff]?" *Id.* In *Aerojet Gen. Corp. v. Askew*, the Fifth Circuit said, "under the [f]ederal law of res judicata a person may be bound by a judgment even though not a party if one of the parties to the suit is so closely aligned with his interests as to be his virtual representative." 511 F.2d 710, 719 (5th Cir. 1975).[14] Going further,

---

[14] "[T]he decisions of the United States Court of Appeals for the Fifth Circuit (the "former Fifth" or the "old Fifth"), as that court existed on September 30, 1981, handed down by that court prior to the close of business on that date, shall be binding as precedent in the Eleventh Circuit, for this court, the district courts, and the bankruptcy courts in the circuit." *Bonner v. City of Pritchard*, 661 F.2d 1206, 1207 (11th Cir. 1981).

one who prosecutes or defends a suit in the name of another to establish or protect his own right or who assists in the prosecution or defense of an action in aid of some interest of his own, and who does this openly to knowledge of the opposing party, is as much bound by the judgment and is fully entitled to avail himself of it as estoppel against an adverse party, as he would be if he had been a party to the record.

*Cotton v. Fed. Land Bank of Columbia*, 676 F.2d 1368, 1371 (11th Cir. 1982) (quoting *Souffront v. La Compagnie des Sucreries de Porto Rico*, 217 U.S. 475, 486-87 (1910)); *see also Weitz Co. v. Tremco Inc. of Ohio*, No. 10-22409-CIV-JORDAN, 2011 WL 13185725, at *4 (S.D. Fla. Mar. 28, 2011) (same). This Circuit's preclusion standards reflect the longstanding and deeply-rooted principle of American law that a party cannot be bound by a judgment in a prior suit in which it was neither a party nor in privity with a party. *EEOC v. Pemco Aeroplex, Inc.*, 383 F.3d 1280, 1286 (11th Cir. 2004) (citing *Martin v. Wilks*, 490 U.S. 755, 761-62 (1989)). "'Privity' is a flexible term, comprising several different types of relationships and generally applying when a person, although not a party, has his interests adequately represented by someone with the same interests who is a party." *Id.* (citation omitted).

The crucial point to note in this case is federal law's requirement of identity of interests and adequate representation. *See, e.g., Hoblock*, 422 F.3d at 92. While the 11 additional defendants were not named in the state-court suit, their interests as agents within the hospital were represented by The Medical Center of Central Georgia, Inc., the sole-named, state-court petitioner. Therefore, it is axiomatic that if the state-court judgment had been in Plaintiff's favor, then each of the 11 additional defendants named in this case would *undoubtedly* be bound by that judgment and thus, could not have

discharged Plaintiff from the hospital. Therefore, Plaintiff's case also satisfies the second procedural element of the *Rooker-Feldman* doctrine.

In consideration of the foregoing, it is clear that to permit Plaintiff's EMTALA claim to continue, a claim that alleges that The Medical Center of Central Georgia, Inc., should not have discharged him in the manner it did, would be a fundamental desecration of federalism. *See Lance v. Dennis*, 546 U.S. 459, 463 (2006) (per curiam) (holding that the *Rooker-Feldman* doctrine prevents the lower federal courts from exercising appellate jurisdiction over cases brought by "state-court losers" effectively challenging "state-court judgments rendered before the district court proceedings commenced"). Any attempt by Plaintiff to unwind the superior court's ruling, due to his dissatisfaction with those proceedings and the outcome from the superior court, must have been brought in the appropriate appellate court. *See Casale,* 558 F.3d at 1260 ("The *Rooker-Feldman* doctrine makes clear that federal district courts cannot review [state-court] final judgments because that task is reserved for state appellate courts or, as a last resort, the United States Supreme Court.").

In light of this analysis, *Rooker-Feldman* principles defeat federal jurisdiction under 28 U.S.C. § 1331 in this case, and Plaintiff's EMTALA claim is barred. Consequently, the Court is not required to address the parties' substantive contentions regarding Plaintiff's EMTALA claim.

*c.*    *Ordinary Principles of Preclusion*

However, in order to ensure the soundness and completeness of its ruling, the

Court now turns to whether Plaintiff's EMTALA claim is barred by ordinary principles

of preclusion. *Exxon Mobil* explains that the narrow *Rooker-Feldman* inquiry is distinct

from the question of whether res judicata (claim preclusion) or collateral estoppel (issue

preclusion) will also defeat a plaintiff's suit. Thus, if by some fashion Plaintiff's EMTALA

claim could be characterized as an independent claim, an analysis apart from *Rooker-*

*Feldman* is warranted and the Court looks to state-preclusion law to determine whether

Plaintiff's claims would nonetheless be barred. *Hoblock*, 422 F.3d at 92-93. Because the Full

Faith and Credit Act, 28 U.S.C. § 1738, requires federal courts to accord state judgments

the same preclusive effect those judgments would have in the courts of the rendering

state, Georgia preclusion law applies. *Id.*

*i.*    *Res Judicata (Claim Preclusion)*

First, under Georgia law, "[t]he doctrine of res judicata prevents the re-litigation

of all claims which have already been adjudicated, or which could have been adjudicated,

between identical parties or their privies in identical causes of action." *Smith v. Bell*, 816

S.E.2d 698, 701 (Ga. Ct. App. 2018) (quoting *Setlock v. Setlock*, 688 S.E.2d 346, 347 (Ga.

2010)). While res judicata began as a common law rule in Georgia, the Georgia Supreme

Court has held that Ga. Code Ann. § 9-12-40 is a codification of Georgia's basic common

law rule of res judicata. *Coen v. CDC Software Corp.*, 816 S.E.2d 670, 672 (Ga. 2018). This code section provides:

> A judgment of a court of competent jurisdiction shall be conclusive between the same parties and their privies as to all matters put in issue or which under the rules of law might have been put in issue in the cause wherein the judgment was rendered until the judgment is reversed or set aside.

*Id.*

As Plaintiff aptly states, Georgia's highest court has explained that in regards to "cause of action" terminology, factual linkage in the subject matter between two cases does not mean that that the second lawsuit will automatically be barred by Ga. Code Ann. § 9-12-40. *Coen*, 816 S.E.2d at 674; *see also* [Doc. 61 at p. 5]. "For [res judicata] to act as a bar, 'the cause of action in each suit must be identical.'" *Coen*, 816 S.E.2d at 674 (citations omitted). The Georgia Supreme Court defines "cause of action" as being

> the entire set of facts which give rise to an enforceable claim. Where . . . some of the operative facts necessary to the causes of action *are different* in the two cases, the later suit is not upon the same cause [of action] as the former, although the subject matter may be the same, and even though the causes [of action] arose out of the same transaction.

*Id.* (alterations in original) (emphasis added). Specifically, Georgia law looks to the "entire set of facts which give rise to an enforceable claim to determine whether res judicata has been triggered." *Id*. (internal quotations omitted). Ultimately under Georgia law, to solidify res judicata's applicability, "three prerequisites must be satisfied—(1) identity of the cause of action, (2) identity of the parties or their privies, and (3) previous adjudication on the merits by a court of competent jurisdiction." *Id.* at 675.

Taking these three requirements into consideration, the same parties (or their privies) are undoubtedly at play in both the state-court action and this case, and the second prong of Georgia's res judicata requirements is satisfied. *Id.*; *see* Section (C)(1)(b), *supra.* Furthermore, the Superior Court of Bibb County, Georgia, is unquestionably "a court of competent jurisdiction." *Coen*, 816 S.E.2d at 675. As a superior court, it has the authority "[t]o exercise the powers of a court of equity" and as such is vested with the authority to hear injunctive claims of the kind presented in the state-court proceeding as well as "all causes, both civil and criminal." Ga. Code Ann. § 15-6-8; *see also* Ga. Const. Art. VI, § 1, ¶ 4 ("Each court may exercise such powers as necessary in aid of its jurisdiction or to protect or effectuate its judgments; but only the superior and appellate courts shall have the power to issue process in the nature of mandamus, prohibition, specific performance, quo warranto, and injunction. Each superior court, state court, and other courts of record may grant new trials on legal grounds.").

Lastly, and what seems to be the most contested prong of res judicata's prerequisites, is an examination of "identity of the cause of action." *Coen*, 816 S.E.2d at 675. Where some of the operative facts between two cases "*are different*," the second suit is not founded upon the same cause of action as the first, despite the possibility that the two cases arose from the same transaction and contain identical subject matter. *Id.* at 674 (emphasis added).

Here, the facts presented in Plaintiff's federal suit are *not* different from the facts presented in the state-court proceeding, despite Plaintiff's contention to the contrary. *See* [Doc. 61 at p. 6]. Succinctly put, Plaintiff, in both cases argues that discharge is improper. His Second Amended Complaint presents nothing different from what occurred in the state-court case. In fact, as discussed above, *see* Section (C)(1)(a), *supra*, Plaintiff clearly presented EMTALA-based arguments in an attempt to prevent his discharge in the earlier state-court proceeding. There is simply nothing different from the operative facts presented in this action when compared to the operative facts previously litigated in state court. Under Georgia law, the cause of action in both suits is identical and, this latter suit is barred by res judicata.[15]

Furthermore, Georgia's codification of its basic common law rule of res judicata provides additional support and guidance on this narrow preclusion issue. Plaintiff's EMTALA claim is one "*which under the rules of law might have been put in issue.*" Ga. Code Ann. § 9-12-40 (emphasis added). Accordingly, his EMTALA claim is also barred as a compulsory counterclaim that he was required to bring in the state-court proceeding to preserve it. *See Bell*, 816 S.E.2d at 702. The Georgia Civil Practice Act provides in pertinent part:

---

[15] To the extent Plaintiff, in his federal case, inserted claims based on a lack of neurological care; libel and slander; harassment; emotional distress; and invasion of privacy in an attempt to differentiate this case's facts from the facts of his previous state-court case, it is exceedingly clear that each of these potential claims were known to him at the time of the state-court proceeding and as such should have been presented there. *See,* Section (2)(a), *infra*.

A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction.

Ga. Code Ann. § 9-11-13(a).

In support of his argument, Plaintiff argues that res judicata should not apply because he was "denied the opportunity to submit a responsive pleading, . . . denied the opportunity to testify, . . . denied the chance to present witnesses, . . . and denied discovery." [Doc. 61 at p. 6]. He contends that the state proceeding was "so limited and streamlined" that he could not "have even begun to assert affirmative claims." [*Id.*]. However, as Defendants point out, Plaintiff cannot show and offers nothing to support that he ever attempted to serve any subpoena, attempted to serve formal discovery, filed a motion to compel the allegedly requested discovery,[16] or ever sought a continuance from the state-court proceedings to prepare his "affirmative claims." [Doc. 63 at p. 3]. Clearly, by his own argument, Plaintiff, at the time of the state-court proceeding had certain "affirmative claims" to present. [Doc. 61 at p. 6].

---

[16] In his Response to Defendants' Motion to Dismiss [Doc. 48], Plaintiff states, "We asked multiple times in that proceeding for production of documents related to the hospital's allegations that they needed [Plaintiff's] bed, or that even one patient had been turned away as alleged by Navicent in their petition. No discovery was ordered." [Doc. 61 at p. 6]. However, Plaintiff offers nothing besides mere conclusory allegations to support this contention, and without more, statements of this nature are "not entitled to the assumption of truth." *McCullough v. Finley*, No. 17-11554, 2018 WL 5318146, at *5 (11th Cir. Oct. 29, 2018). The Court notes that the superior court specifically found that Plaintiff was no longer "in need of acute care" and that his actions were "harming" Defendants by "preventing it from meeting its public duty by the loss of a hospital bed, by adding to overcrowding at its facility, and by straining its ability to care for other patients." [Doc. 33-2 at p. 4].

While the Court lacks sufficient knowledge to determine what transpired in the state-court proceeding (aside from the transcript excerpts throughout Plaintiff's Second Amended Complaint), it is clear that Plaintiff had the unequivocal ability and absolute right to bring his EMTALA claim as an "affirmative claim" in the earlier state-court proceeding. In fact, the Second Amended Complaint presents Dr. Smith's testimony demonstrating Plaintiff's arguments against his discharge on EMATALA grounds. *See* [Doc. 42 at pp. 15-17]. By Plaintiff's own admission, "[a]n EMTALA violation occurs when a hospital discharges a patient in a manner which exposes the patient to imminent material deterioration in their condition." [Doc. 61 at p. 3 (citing *Quinney v. Phoebe Putney Mem. Hosp., Inc.*, 751 S.E.2d 874, 881 n.8 (Ga. Ct. App. 2013) (citing 42 U.S.C. § 1395dd(e)(3)(A)))]. While it is true that Plaintiff did not formally raise an EMTALA violation as a defense, he certainly made countless arguments surrounding this standard. Plaintiff's own filings demonstrate that the state court in no way prevented him from arguing and presenting certain defenses or denied him the opportunity to file any counterclaims. But, even if such scenario is in fact true, Plaintiff's remedy is not in a federal district court, but rather in the appropriate state appellate court or the United States Supreme Court.[17]

---

[17] There is nothing in the record to indicate that Plaintiff either filed a motion for a new trial in the state-court case or appealed the state court's ruling to either of Georgia's appellate courts.

Consequently, assuming that Plaintiff's EMTALA claim is not barred by the *Rooker-Feldman* doctrine, it is nonetheless clearly a compulsory counterclaim because it involves the same "cause of action" and "transaction or occurrence that [wa]s the subject matter of the opposing party's [(The Medical Center of Central Georgia, Inc.)] claim." *Coen*, 816 S.E.2d at 674; Ga. Code Ann. § 9-11-13(a). As such, Plaintiff was required to address his alleged EMTALA violation in state court given that the actions he complained about arose from the transaction or occurrence that was the subject of the state-court proceeding.

ii.     *Collateral Estoppel (Issue Preclusion)*

Having determined that res judicata, under Georgia law, and Georgia's compulsory counterclaim statute both apply to bar Plaintiff's EMTALA claim, the Court must determine whether the related doctrine of collateral estoppel (issue preclusion) also applies. The doctrine of collateral estoppel

> precludes the re-adjudication of an issue that has previously been litigated and adjudicated on the merits in another action between the same parties or their privies. Like res judicata, collateral estoppel requires the identity of the parties or their privies in both actions. However, unlike res judicata, collateral estoppel does not require identity of the claim—so long as the issue was determined in the previous action and there is identity of the parties, that issue may not be re-litigated, even as part of a different claim.

*Salem Crossing Townhomes Homeowners Ass'n, Inc. v. Wagner*, ___S.E.2d___, 2018 WL 4998235, at *2-3 (Ga. Ct. App. 2018) (quoting *Fulton Cty. Tax Comm'r v. Gen. Motors Corp.* 507 S.E.2d 772, 778-79 (Ga. Ct. App. 1998)). Going further, Georgia case law provides that

34

collateral estoppel applies to "those issues that actually were litigated and decided in the previous action, or that necessarily had to be decided in order for the previous judgment to have been rendered." *Salem Crossing*, 2018 WL 4998235, at *3 (citation omitted).

Accordingly, even though Plaintiff did not bring his EMTALA claim in the state-court proceeding, it is clear that the state-court judge found sufficient cause to permit Plaintiff's conditional discharge. *See generally* [Doc. 33-2]. The Second Amended Complaint presents relevant excerpts from the state-court hearing for the court to determine that the "issue" of EMTALA "was decided in the previous action." *See, e.g.*, [Doc. 42 at pp. 3-11, 15-23]; *see also Salem*, *supra*. As Defendants argue and Plaintiff admits, and considering the available excerpts, it is clear that the state-court judge "was concerned about what had happened" and "gave wide latitude for [P]laintiff to assert claims relating to his discharge." [Doc. 63 at p. 3]; *see also* [Doc. 42 at ¶ 89].[18] Taking into consideration what Plaintiff could have conceivably presented in his defense at the state-court hearing or in his post-hearing brief, the state-court judge still ruled in favor of The

---

[18] Most notably to show the superior court judge's careful oversight of the state-court case, Plaintiff's Second Amended Complaint quotes the superior-court hearing as follows:

| Court: | [T]his [is] a very serious application. |
| | A very serious application. |
| | I am giving this the great weight it deserves. Okay? This is a very serious allegation. |
| Panitz: | Thank you, Judge. I'll need the transcript before I brief but thank you. |
| Court: | No, of course you will. |

[Doc. 42 at ¶ 89 (transcript citations omitted)]. The Court is without the knowledge to know whether Plaintiff actually submitted any post-hearing brief, but what is evident, by Plaintiff's own admission, is that before the superior court judge issued his ruling, he was undoubtedly given the opportunity to do so.

Medical Center of Central Georgia, Inc., but with the certain conditions as outlined above. Thus, the state-court decision clearly contains issues that show an EMTALA issue "necessarily had to be decided" in order for the state-court judge to even render a decision as to the injunctive relief sought by The Medical Center of Central Georgia, Inc. *Salem Crossing*, 2018 WL 4998235, at *3 (citation omitted). Again, to permit Plaintiff's EMTALA claim to proceed in this federal lawsuit could invite potential reversal of the state-court decision. In order to reach his ruling, the state-court judge effectively "decided" that *any* discharge would not violate EMTALA, and Plaintiff, dissatisfied with that judgment, now seeks a different ruling in federal court. *Salem Crossing*, 2018 WL 4998235, at *3 (citation omitted). This simply is not allowed.

Moreover, Plaintiff (as the defendant/respondent in the state-court proceeding) could have filed his EMTALA counterclaim and *then*, given the presence of a federal question, removed The Medical Center of Central Georgia, Inc.'s, case to federal court. This he did not do, and as stated numerous times, if Plaintiff felt he had been wronged by the state court's decision, his relief rested with state appellate courts or the United States Supreme Court—not the lower federal courts. *See Casale,* 558 F.3d at 1260. In addition to the doctrine of res judicata, the issue of an EMTALA claim "was determined in the previous action," thus, collateral estoppel's appositeness under Georgia law, further shows that Plaintiff's EMTALA claim is barred. *Salem Crossing*, 2018 WL 4998235, at *3 (citation omitted).

In light of the foregoing, the Court rules that *Rooker-Feldman* defeats the Court's exercise of federal-question jurisdiction. *See Wood*, 715 F.2d at 1546, *supra*, Section (C)(1). Additionally, Plaintiff's EMTALA claim is also subject to the procedural bars related to the ordinary principles of preclusion under Georgia law regarding res judicata and collateral estoppel. Accordingly, the Court must **DISMISS** Plaintiff's EMTALA claim, and thus, need not consider the parties' additional substantive arguments regarding Plaintiff's EMATALA claim pursuant to the traditional standard under Federal Rule of Civil Procedure 12(b)(6).

2.    Diversity Jurisdiction Under 28 U.S.C. § 1332

Having determined that the Court cannot exercise federal-question jurisdiction over this case, the Court must consider Defendants' certain jurisdictional concerns related to diversity of citizenship between the parties as to Plaintiff's remaining state-law claims. [Docs. 48-1; 63]. Defendants contend that "it would be appropriate for the Court to conduct a factual inquiry to confirm the existence of facts establishing Plaintiff's domicile in New York." In light of these concerns and because "it is fundamental that parties may not stipulate to federal jurisdiction," the Court held a telephone conference[19] inquiring

---

[19] When it comes to diversity jurisdiction, "[d]istrict courts have the discretion to resolve parties' motions without an evidentiary hearing" and "[a] court does not abuse its discretion when it decides a motion to dismiss for lack of jurisdiction without an evidentiary hearing 'when neither party makes a timely and unequivocal request for a [ ] hearing.'" *Antoine v. Verin*, ___ F. App'x ___, No. 18-10645, 2018 WL 3860477, at *3 (11th Cir. Aug. 14, 2018) (quoting *Sunseri v. Macro Cellular Partners*, 412 F.3d 1247, 1251 (11th Cir. 2005)).

into Plaintiff's domicile. *Travaglio v. Am. Exp. Co.*, 735 F.3d 1266, 1269-70 (11th Cir. 2013); [Doc. 48-1 at pp. 8-9]; [Doc. 38].

Under 28 U.S.C. § 1332:

(a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between—
  (1) citizens of different States;
  (2) citizens of a State and citizens or subjects of a foreign state, except that the district courts shall not have original jurisdiction under this subsection of an action between citizens of a State and citizens or subjects of a foreign state who are lawfully admitted for permanent residence in the United States and are domiciled in the same State; . . .

28 U.S.C. § 1332(a)(1)-(2). The Eleventh Circuit has held that

the law is clear regarding a federal court's limited subject matter jurisdiction; specifically, [federal courts] only have the authority to decide certain types of cases. Further, the party invoking the court's jurisdiction bears the burden of proving, by a preponderance of the evidence, facts supporting the existence of federal jurisdiction.

*McCormick v. Aderholt*, 293 F.3d 1254, 1257 (11th Cir. 2002) (internal citations omitted); *see also Scoggins v. Pollock*, 727 F.2d 1025, 1026 (11th Cir. 1984). During the telephone conference, Plaintiff's counsel stated that Plaintiff is not a natural-born citizen of the United States, but he also assured both the Court and opposing counsel that Plaintiff had met the requirements for consideration as an individual "lawfully admitted for permanent residence in the United States." 28 U.S.C. § 1332(a)(2). Plaintiff further stated that he has a residence in New York as reflected by an address listed on this case's civil cover sheet [Doc. 2 at p. 2]. Given that Defendants' counsel took Plaintiff's counsel at his

word and offered nothing to refute or disprove the proffered statements, Defendants, as well as the Court, accepted Plaintiff's contentions regarding his resident alien status. Accordingly, the Court found that Plaintiff's domicile[20] lies in New York. As such, there is complete diversity among the parties in this case and the Court possesses diversity jurisdiction to rule on Plaintiff's state-law claims.

### a.    Plaintiff's State-Law Tort Claims

In addition to his EMTALA claim, Plaintiff brings a litany of state-law claims. First, Plaintiff asserts two causes of action (Counts 2 & 3) involving alleged medical malpractice against various medical professionals. [Doc. 42 at pp. 30-34]. The remaining state-law claims include: libel and slander; harassment; emotional distress; and invasion of privacy. [Doc. 42 at pp. 35, 37, 40-42]. However, while these state-law claims arguably do not "complain of a state-court judgment" and therefore, may not prompt a *Rooker-Feldman* analysis, they most certainly complain of tortious actions allegedly committed by Defendants that arose from the same set of operative facts that gave rise to the previous state-court proceedings. As such, these claims—brought against Defendants in this federal suit—present comparable procedural complexities.

Given the lack of federal-question jurisdiction in this case, the Court (sitting in diversity as to these remaining state-law claims) must apply federal procedural law to

---

[20] "State citizenship, or 'domicile' for purposes of diversity jurisdiction, is determined by two factors: residence [(physical presence)] and intent to remain." *Las Vistas Villas, S.A. v. Petersen*, 778 F. Supp. 1202, 1204 (M.D. Fla. 1991).

determine the claims' preclusive effect. *Esfeld v. Costa Crociere, S.P.A.*, 289 F.3d 1300, 1306 (11th Cir. 2002) ("A federal court sitting in diversity must apply state substantive law and federal procedural law."). Federal procedural law provides the same points as those contained in Georgia's Civil Practice Act. Specifically,

> [a] pleading must state as a counterclaim any claim that—at the time of its service—the pleader has against an opposing party if the claim: (A) arises out of the transaction or occurrence that is the subject matter of the opposing party's claim; and (B) does not require adding another party over whom the court cannot acquire jurisdiction.

Fed. R. Civ. P. 13(a).

This circuit's predecessor, the Fifth Circuit Court of Appeals, "adopted the 'logical relationship' test for determining whether a counterclaim was compulsory. *Republic Health Corp. v. Lifemark Hosps. of Fl., Inc.*, 755 F.2d 1453, 1455 (11th Cir. 1985) (citation omitted). "Under this test, there is a logical relationship [between the opposing party's claim and a potential counterclaim] when 'the same operative facts serve as the basis of both claims or the aggregate core of facts upon which the claim rests activates additional legal rights, otherwise dormant, in the [counterclaimant].'" *Id.* (citation omitted).

### 1.      Medical Malpractice

First, Defendants seek dismissal of Plaintiff's medical malpractice claims (Counts 2 & 3) on the grounds that he failed to file the affidavit required by Ga. Code Ann. § 9-11-9.1. "In federal courts, 'state law governs substantive issues, . . . while federal law governs pleading requirements.'" *Durden v. Newton Cty.*, No. 1:14-CV-01163-RWS, 2015 WL 71446,

at *2 (N.D. Ga. Jan. 5, 2015) (quoting *Brown v. Nichols*, 8 F.3d 770, 773 (11th Cir. 1993)). Because the Georgia affidavit requirement for medical malpractice claims is a procedural vehicle, and "not substantive state law," it does not apply in federal courts. *Id.* (citation omitted). Thus, the Court rejects this argument as a basis for dismissal.

However, it is of vital importance to note that Plaintiff's medical malpractice claims *only* surround allegations that occurred *during* the 160-day period he was admitted as a patient. Nothing in Plaintiff's Second Amended Complaint could reasonably be construed as a medical malpractice claim against Defendants, or another third party (such as the skilled nursing facility to which Plaintiff was purportedly discharged) for that matter, *after* the date of his discharge. Consequently, Plaintiff's allegations that Defendants breached "the[ir] duty under federal law, the law[s] of Georgia, and other applicable laws and medical standards" all arose from the "occurrence" that was the subject matter of The Medical Center of Central Georgia, Inc.'s, original claim in state court. Fed. R. Civ. P. 13(a); [Doc. 42 at p. 30].

Therefore, Plaintiff should have sought to pause the state-court case against him, requested a continuance, regrouped, and then asserted *in state court* the two medical malpractice claims he now seeks to bring in this lawsuit because they involved "the same operative facts" as those presented in state court. *Republic Health Corp.*, 755 F.2d at 1455; Fed. R. Civ. P. 13(a). Accordingly, the Court **DISMISSES** Plaintiff's medical malpractice

claims (Counts 2 & 3) against Defendants on the grounds that they should have been asserted in state court and are therefore barred as compulsory counterclaims.

## 2. Libel, Slander, and Harassment

Second, Plaintiff's Second Amended Complaint sets forth claims of libel and slander (Counts 5 & 8, presumably) and a claim of harassment (Count 4). [Doc. 42 at pp 35-40, 42-44]. As structured, Plaintiff's Second Amended Complaint intermingles each of these actions (plus "further emotional distress") within Counts 4, 5, and 8. [*Id.*]. Specifically, Plaintiff complains that Defendants "maliciously accused [Plaintiff] of being a criminal trespasser" and that Defendants actions "publicly smear[ed] [Plaintiff] as a means to "harass and embarrass" him. [*Id.* at ¶¶ 166-67]. However, as Plaintiff states, the accusations labeling Plaintiff as a "criminal trespasser" were asserted in The Medical Center of Central Georgia, Inc.'s, state-court petition. [*Id.* at ¶ 74 ("In their baseless petition, the hospital proudly called [Plaintiff] a *criminal trespasser*, . . . ." (italics in original))]. Irrespective of Plaintiff's "buzzword-pleading," it is clear that the accusations contained within these claims enjoy absolute privilege[21] because they were allegedly made within the course of a legal proceeding. *Williams v. Stepler*, states:

> [a]ll charges, allegations, and averments contained in regular pleadings filed in a court of competent jurisdiction, which are pertinent and material to the relief sought, whether legally sufficient to obtain it or not, are

---

[21] According to the Georgia Court of Appeals, "[t]he privilege is intended 'for the promotion of the public welfare, the purpose being that . . . judges of courts, . . . *lawyers, and witnesses* may speak their minds freely and exercise their respective functions without incurring the risk of a criminal prosecution or an action for the recovery of damages.'" *Williams v. Stepler*, 490 S.E.2d 167, 171 (Ga. Ct. App. 1997) (emphasis added) (citation omitted).

> privileged. However false and malicious such charges, allegations, and averments may be, they shall not be deemed libelous.

490 S.E.2d 167, 171 (Ga. Ct. App. 1997) (citing Ga. Code Ann. § 51-5-8). In response, Plaintiff stresses that "privilege extends only to allegations 'which are pertinent and material to the relief sought.'" [Doc. 61 at p. 17, n.13 (citing *Vito v. Paley*, 604 S.E.2d 620, 621 (Ga. Ct. App. 2004)]. However, notwithstanding Plaintiff's argument that Defendants' reliance on *Vito* is misplaced and that Plaintiff's doctors testified that Plaintiff "was just trying to get better," Plaintiff fails to articulate any reason why such accusations were not "pertinent and material" to the issues presented in the earlier state-court pleadings. 604 S.E.2d at 621; *see also* [Docs. 33-1; 61 at p. 17 n.13]. Plaintiff's claims include accusations made by The Medical Center of Central Georgia, Inc., that were undoubtedly made within "official court documents" or include "acts of 'legal process.'" *Stepler*, 490 S.E.2d at 171 (citations omitted).

Furthermore, Plaintiff was fully aware of The Medical Center of Central Georgia, Inc.'s, accusations in the earlier proceeding, and under the rules of compulsory counterclaims outlined above, he must have addressed these claims in state court because "the same operative facts serve as the basis" of any claim he should have brought in state court and the claims he currently brings in this action. *Republic Health Corp.*, 755 F.2d at 1455; Fed. R. Civ. P. 13(a). Therefore, the Court finds that Defendants' accusations, including their labeling Plaintiff as a "criminal trespasser," are deemed privileged and, as an additional and alternative basis, barred as compulsory counterclaims. Accordingly,

the Court **DISMISSES** Plaintiff's libel and slander claims (Counts 5 & 8, presumably) as well as his claim for harassment[22] (Count 4) given that such claim cannot stand absent some other legally recognized claim.

### 3.    Emotional Distress

Third, Plaintiff's Second Amended Complaint sets forth a claim for emotional distress (Count 6). [Doc. 42 at p. 40]. Notably, this count only makes allegations related to Defendants' alleged "failure to exercise due care" and their knowledge that such a level of care "would cause Plaintiff to suffer severe emotional distress . . . ." [*Id.* at ¶ 173]. Plaintiff clearly states that "[a]s direct and proximate result of said conduct [he] was caused to sustain serious[] permanent, personal injuries and suffering, including pain, suffering, progressive cognitive decline, distress, depression, mental anguish, humiliation, and other physical and personal losses." [*Id.* at ¶ 174].

Additionally, it is worth noting that Plaintiff's emotional distress claim stems from, what he describes as a "4-prong conspiracy." [Doc. 61 at p. 13]. Plaintiff argues that

> Defendants engineered a 4-prong conspiracy to get [Plaintiff] out— denying him neurological oversight for [five] months[;] trying to wrongfully evict him in June 2017[,] despite all of his acute conditions; dumping him out to the hospital exit on August 9, 2017[;] and suing [Plaintiff], falsely alleging that he was a *criminal trespasser*.

---

[22] Defendants argue that there is not a civil cause of action for "'harassment' divorced from some other legally recognized claim." Plaintiff does not address or refute this contention in his Response. [Doc. 48-1 at p. 19 (citing *Robinson v. McDonald*, No. 1:16-CV-3486-TWT, 2016 WL 9308020, at * 1 (N.D. Ga. Nov. 22, 2016)].

[*Id.* (emphasis in original)]. To support his four-pronged conspiracy theory, Plaintiff directs the Court to *Crisp Reg'l Nursing & Rehab. Ctr. v. Johnson*, for the proposition that "displacing [a] patient out of [his] room" constitutes a "[h]ospital staff['s] deliberate disregard for a patient's basic needs and concerns [and] support[s] a finding of intentional infliction of emotional distress." 574 S.E.2d 650 (Ga. Ct. App. 2002). While the court in *Crisp Reg'l.* found that whether such outrageous conduct caused severe and emotional distress was for determination by "[a] reasonable jury," Defendants, in reply argue that their conduct was "not outrageous" and therefore is not subject to jury determination. *Id.* at 655; [Doc. 63 at p. 9].

Specifically, Defendants contend that their conduct does not fall within the ambit of the disapproving conduct discussed in *Crisp Reg'l.* because "[Navicent Health] took the reasonable step of seeking [c]ourt intervention when [Plaintiff] refused discharge plans that the staff presented." [Doc. 63 at p. 9]. As to Plaintiff's first prong—five months of neurological oversight—Defendants show that "[w]hether [Plainitff] needed additional specialists or tests was addressed by [the state court]" which "[would] not substitute its own judgment for that of the medical providers caring for [Plaintiff]." [*Id.* quoting [Doc. 33-2 at p. 8]]. Taking this into consideration, it appears that the state-court judge already passed ruling as to Plaintiff's emotional distress claim regrading Defendants' purported "failure to exercise due care." [Doc. 42 at p. 40]. Thus, Plaintiff's request of asking this Court to deny dismissal of his emotional distress claim, once again

treads the waters of *Rooker-Feldman* and cannot be adjudicated here as federal district courts cannot exercise appellate jurisdiction over state-court judgments. *Sophocleus*, 170 F. App'x at 610 (citing *Exxon Mobil Corp.*, 544 U.S. at 292); *see also* 28 U.S.C. § 1257(a).

Crucially, Plaintiff's allegations, regarding his emotional distress claim like his other tort claims against Defendants, do not present any facts occurring *after* the discharge itself. In other words, Plaintiff only pleads that what occurred in the events leading *up to the discharge* created a viable emotional distress claim. Therefore, this state-tort claim, like the others, would have been an appropriate counterclaim in the state-court action given that "the same operative facts serve as the basis" for any emotional distress claim, whether asserted in the earlier state-court proceeding, or here. *Republic Health Corp.*, 755 F.2d at 1455; Fed. R. Civ. P. 13(a). Accordingly, the Court **DISMISSES** Plaintiff's emotional distress claim (Count 6).

4.      Invasion of Privacy

Last, Plaintiff brings an invasion of privacy claim (Count 7). [Doc. 42 at pp. 41-42]. The presentment of this claim states that Defendants violated both "Georgia and federal privacy laws" but, as Defendants note, fails to identify neither the state nor the federal law upon which Plaintiff rests his claim. [*Id*. at p. 42]. As stated above, in the Court's Standard of Review, *see* Section (A), *supra*, a complaint attacked by a 12(b)(6) motion is subject to dismissal when it fails to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555.

It is true that a Plaintiff may certainly use legal conclusions such as, "the [D]efendants did invade and violate [Plaintiff's] privacy rights," and "th[e] conduct by the [D]efendants was specious in violation of both Georgia and federal privacy laws," to structure his complaint, but he *must* support such conclusions with factual allegations. *McCullough*, 907 F.3d at 1333 (quoting *Iqbal*, 556 U.S. at 679). Because Plaintiff's Second Amended Complaint fails to assert on *which* state and/or federal privacy laws he brings his invasion of privacy claim, it is subject to dismissal under Federal Rule of Civil Procedure 12(b)(6).

Furthermore, as with Plaintiff's other state-tort claims, his invasion of privacy claim should have also been brought as a counterclaim in the earlier state-court proceeding given that it arises from "the same operative facts" under which The Medical Center of Central Georgia, Inc., asserted its claims. *Republic Health Corp.*, 755 F.2d at 1455; Fed. R. Civ. P. 13(a). Therefore, Plaintiff's invasion of privacy claim is subject to dismissal not only because it fails to give Defendants fair notice of what law, either state or federal, they are charged with violating and the factual bases upon which the alleged violation rests (and thereby fails to state a claim under Federal Rule of Civil Procedure 12(b)(6)), but also because the claim is a compulsory counterclaim under Federal Rule of Civil Procedure 13(a). Accordingly, the Court **DISMISSES** Plaintiff's invasion of privacy claim (Count 7).

b.  *Plaintiff's Arguments Regarding the Hospital Lien Filed in Bibb, Dougherty,[23] and Worth Counties*

In his Second Amended Complaint, Plaintiff's ninth cause of action seeks to invalidate a hospital lien "asserting purported claims upon causes of action accruing to the Plaintiff on account of injuries caused by unnamed third parties who caused Plaintiff[] to need care in the [D]efendants' hospital facility." [Doc. 42 at p. 44]. This ninth cause of action rests on the premise that the lien should be invalidated because notice was not provided as required by statute. [Doc. 48-1 at p. 19]. Plaintiff's Second Amended Complaint makes no mention of the county or counties in which The Medical Center of Central Georgia, Inc., filed its lien. However, Defendants, for the sake of clarity—in the instant motion—referenced "Exhibit C," from their first Motion to Dismiss [Doc. 33] Plaintiff's Amended Complaint [Doc. 26]. [Doc. 48-1 at p. 19], In that exhibit, the "Notice of Filing of Hospital Lien" indicates that the liens are filed in Bibb, Dougherty, and Worth counties. [Doc. 33-3].

To start, The Medical Center of Central Georgia, Inc., "provided notice of its intent to claim a lien" "[a]s provided in" Ga. Code Ann. § 44-14-470, on September 19, 2017. [Doc. 33-1 at p. 1]. However, Plaintiff argues that The Medical Center of Central Georgia, Inc., failed to provide written notice to him, and therefore, failed to follow the

---

[23] Defendants' Brief In Support states that the "lien [was] filed in Bibb, Daugherty [sic], and Worth counties." [Doc 48-1 at p. 19]. Whereas the "Notice of Filing Hospital Lien" shows that the relevant counties are "Bibb, Dougherty, [and] Worth" counties." [Doc. 33-3 at p. 1].

requirements for perfection of the lien as outlined in Ga. Code Ann. § 44-14-471(a). [Doc. 61 at p. 17]. The method of perfecting an existing lien is as follows:

(a) In order to perfect the lien provided for in Code Section 44-14-470, the operator of the hospital, nursing home, physician practice, or provider of traumatic burn care medical practice:

(1) Shall, not less than 15 days prior to the date of filing the statement required under paragraph (2) of this subsection, provide written notice to the patient *and*, to the best of the claimant's knowledge, the persons, firms, corporations, and their insurers claimed by the injured person or the legal representative of the injured person to be liable for damages arising from the injuries and shall include in such notice a statement that the lien is not a lien against the patient or any other property or assets of the patient and is not evidence of the patient's failure to pay a debt. Such notice shall be sent to all such persons and entities by first-class and certified mail or statutory overnight delivery, return receipt requested; and

(2) Shall file in the office of the clerk of the superior court of the county in which the hospital, nursing home, physician practice, or provider of traumatic burn care medical practice is located and in the county wherein the patient resides, if a resident of this state, a verified statement setting forth the name and address of the patient as it appears on the records of the hospital, nursing home, physician practice, or provider of traumatic burn care medical practice; the name and location of the hospital, nursing home, physician practice, or provider of traumatic burn care medical practice and the name and address of the operator thereof; the dates of admission and discharge of the patient therefrom or with respect to a physician practice, the dates of treatment; and the amount claimed to be due for the hospital, nursing home, physician practice, or provider of traumatic burn care medical practice care, which statement must be filed within the following time period:

(A) If the statement is filed by a hospital, nursing home, or provider of traumatic burn care medical practice, then the statement shall be filed within 75 days after the person has been discharged from the facility; or

(B) If the statement is filed by a physician practice, then the statement shall be filed within 90 days after the person first sought treatment from the physician practice for the injury.

(b) The filing of the claim or lien shall be notice thereof to all persons, firms, or corporations *liable for the damages*, whether or not they received the written notice provided for in this Code section. The failure to perfect such lien by timely complying with the notice and filing provisions of paragraphs (1) and (2) of subsection (a) of this Code section shall invalidate such lien, except as to any person, firm, or corporation liable for the damages, which receives prior to the date of any release, covenant not to bring an action, or settlement, actual notice of a notice and filed statement made under subsection (a) of this Code section, via hand delivery, certified mail, return receipt requested, or statutory overnight delivery with confirmation of receipt.

Ga. Code Ann. § 44-14-471 (2006) (emphasis added).

The Medical Center of Central Georgia, Inc., undoubtedly filed its lien within 75 days of Plaintiff's discharge (Sept. 5, 2017) in Bibb (Oct. 24, 2017), Dougherty (Oct. 23, 2017), and Worth (Oct. 24, 2017) counties. [Doc. 33-3]. Plaintiff's issue is that The Medical Center of Georgia, Inc., "never provided written notice of said or any lien as required by said statute." [Doc. 42 at p. 44]. However, despite the scarce case law regarding validity of hospital liens, the Court concludes that Plaintiff's argument is somewhat misguided and, therefore, premature.

Plaintiff is undoubtedly correct that the lien statute clearly necessitates that "written notice" "*shall*" be given "to the patient" and "to . . . the persons, firms, corporations, and their insurers claimed by the injured person or the legal representative of the injured person to be liable for damages arising from the injuries." Ga. Code Ann. §

44-14-471(a)(1) (emphasis added). A plain reading of this portion of the statute clearly shows that notice must be given to *two* different sets of people: the patient and those who may be liable for Plaintiff's injuries. *Id.* Plaintiff contends that Defendants never gave him notice, and the lien is therefore unenforceable.

However, subsection (b) provides that "[t]he filing of the claim or lien shall be notice thereof to all persons, firms, or corporations *liable for the damages*, whether or not they received the written notice provided for in [subsection (a)]." Ga. Code Ann. § 44-14-471(b). This subsection acts as somewhat of a saving grace for the lien as to those "persons, firms, or corporations" who may be liable for the damages, but, based on the plain text of the statute, this savings clause does not provide a safe harbor for a hospital's failure to notify the patient of its intent to file a lien.

Moreover, even if it is true that Defendants never provided Plaintiff notice of the lien, there is currently no cause of action against which the lien would operate. Effectively, Plaintiff is asking the Court invalidate a hospital lien that is merely sitting idle with no sign of enforceability on the horizon.[24] Because Plaintiff seeks a declaratory judgment that the hospital lien "and any other lien" is invalid (as to him) given Defendants failure to provide written notice to him under Ga. Code Ann. § 44-14-471(a)(1), "[s]trict application of the ripeness doctrine prevents federal courts from

---

[24] There is nothing in the record to indicate that Plaintiff has filed any claim against the driver who allegedly struck the automobile in which he was a passenger on March 29, 2017 or the driver of the car in which he was riding. [Doc. 42 at ¶ 5].

rendering impermissible advisory opinions and wasting resources through review of potential or abstract disputes." *Nat'l Advertising Co. v. City of Miami*, 402 F. 3d 1335, 1339 (11th Cir. 2005); [Doc. 42 at p. 44]. Accordingly, for the reasons stated above and until such time as the hospital actually attempts to enforce its lien against a pending settlement between Plaintiff and one liable to him for his damages, the Court is constrained to leave the question of whether Plaintiff has a direct cause of action to invalidate the lien for a later date.[25]

Therefore, as it stands now, because no such resolute action has been taken, and until such time as The Medical Center of Central Georgia, Inc., seeks to enforce the lien against those who may be liable for damages, its mere filing constitutes notice to those

---

[25] An additional basis for the Court's conclusion—that Plaintiff's attempt to invalidate the lien is premature—is based on the fact that there is nothing in the record to indicate that anyone in this case entered into "any release, covenant not to bring an action, or settlement." Ga. Code Ann. § 44-14-471(b). Moreover, this statute could only be invoked as *a defense* against the lienholder *when the lienholder* attempts to enforce its lien—and recover on unpaid medical bills—from a separate action in which Plaintiff recovered some amount of damages. The cause of action afforded by this statute allows a "*hospital*, nursing home, physician practice, or provider of traumatic burn care medical practice" to collect on a judgment. Ga. Code Ann. § 44-14-470. It does not appear to create a cause of action for Plaintiff to invalidate a lien, and the Court will not read an implied right of action into the statute. *See Bellsouth Telecomm., LLC v. Cobb Cty.*, 802 S.E.2d 686, 690 (Ga. Ct. App. 2017) ("Georgia has longstanding precedential authority rejecting the creation of implied private rights of action."), *cert. granted*, S17G2011 (Ga. Apr. 16, 2018). The Georgia Court of Appeals further explains:

> In 2010, the General Assembly codified this presumption in [Ga. Code Ann.] § 9-2-8(a), which provides that '[n]o private right of action shall arise from any Act enacted after July 1, 2010, unless such right is expressly provided therein.' Our Supreme Court has noted that the creation of [Ga. Code Ann.] § 9-2-8 revealed the General Assembly's concern over 'judicial creation of implied civil causes of action.' Although [Ga. Code Ann.] § 9-2-8(a) 'would not apply to the pre-existing [§ 44-14-471] at issue in this case, . . . it certainly counsels against deviating from our established precedent to find new implied civil causes of action.'

*Bellsouth Telecomm., LLC v. Cobb Cty.*, 802 S.E.2d 686, 690 (Ga. Ct. App. 2017).

"persons, firms, or corporations" and that is all that is required at this point. Ga. Code Ann. § 44-14-471(b). To put a finer point on the Court's decision, there is simply no "case or controversy" between the Plaintiff and Defendants regarding the validity of the hospital lien because there is no settlement or judgment against which the hospital could attempt to enforce its lien. Thus, Plaintiff's declaratory judgment count is not ripe, assuming that he has a direct cause of action to contest the lien's validity.

In Response to Defendants' attempt to uphold the validity of the hospital lien, Plaintiff argues that "[i]f the defense of res judicata argument has merit, it would bar . . . [D]efendants' own counterclaim for payment of their hospital bill. Under [their] own argument, . . . [D]efendants would be barred from ever litigating their alleged unpaid bill since [they] did not pursue payment in the state court in 2017." [Doc. 61 at p. 9]. This argument, especially considering the contents of this order, merits discussion.

To this point, it is axiomatic that a hospital lien may not be filed until "after the person has been discharged from the facility." Ga. Code Ann. § 44-14-471(a)(2)(A). Clearly, The Medical Center of Central Georgia, Inc., could not have filed its lien at the time of the state-court proceeding based on the fact that Plaintiff had not yet been discharged. As a result, there is nothing to support a res judicata-based argument that Defendants should have litigated the hospital bills in the earlier proceeding.

As explained above, the Court **DISMISSES** Plaintiff's demand for a declaratory judgment (Count 9) that the hospital lien is invalid because it is not yet ripe.

c.      *Plaintiff's Claims Regarding Attorney's Fees, Punitive Damages, and Treble Damages*

Given the Court's ruling on Defendants' motion, Plaintiff's claims for attorney's fees, punitive damages, and treble damages are likewise due to be dismissed because they are derivative of his underlying Georgia tort law claims. *See Love v. WEECCO(TM)*, No. 1:18-CV-540-TWT, 2018 WL 5044639, at *3 n.28 (N.D. Ga. Oct. 17, 2018) (citing *Perkins v. Thrasher*, 701 F. App'x 887, 891 (11th Cir. 2017)); *see also Lilliston v. Regions Bank*, 653 S.E.2d 306, 311 (Ga. Ct. App. 2007) (explaining that dismissal of underlying substantive claims warrants dismissal of derivative claims for punitive damages); *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1316 (11th Cir. 2004) (per curiam) (establishing that a claim for attorney's fees under Ga. Code Ann. § 13-6-11 requires an underlying claim). Therefore, Plaintiffs' claims for punitive damages, treble damages, and attorney's fees are also dismissed in light of the Court's ruling.

## CONCLUSION

Based on the reasoning described above, the Court **DISMISSES** Plaintiff's EMTALA claim on the grounds that it is barred by the *Rooker-Feldman* doctrine and, in the alternative, the doctrines of res judicata and/or collateral estoppel. Furthermore, the Court **GRANTS**[26] Defendants' Motion to Dismiss [Doc. 48] Plaintiff's Second Amended Complaint [Doc. 42] and **DISMISSES** Plaintiff's state-law claims for medical malpractice;

---

[26] As a result of the Court's ruling, the Court also **TERMINATES** Defendants' Motion to Dismiss Complaint [Doc. 33] **as moot**.

libel and slander; harassment; emotional distress; and invasion of privacy on the grounds that they are barred as compulsory counterclaims under Federal Rule of Civil Procedure 13(a). Finally, Plaintiff's claim to invalidate the lien filed in Bibb, Dougherty, and Worth counties is **DISMISSED without prejudice** as it is not yet ripe. Consequently, the Court **DIRECTS** the Clerk of Court to **ENTER JUDGMENT** for all Defendants and **CLOSE** this case.

      **SO ORDERED**, this 12th day of December, 2018.

S/ Tilman E. Self, III

**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**